15876

STATE v. EPES

(39 S. E. (2d), 769)

248

*Messrs. Edgar A. Brown* and *Jas. Julien Bush,* of Barnwell, *L. S. Bremner,* of Richmond, Va., *Richard E. Broome* and *J. A. Hutto,* of Columbia, and *A. F. Woods,* of Marion, for Appellant,

*Messrs. T. P. Taylor,* Solicitor, and *C. T. Graydon* and *John Grimball,* of Columbia, for Respondent,

October 18, 1946.

MR. ASSOCIATE JUSTICE FISHBURNE delivered the majority opinion of the Court.

Under an indictment charging him with the murder of his wife, Mary Lee Epes, on January 28, 1945, by administering to her sodium seconal, a deadly poison, the appellant was put upon his trial in the court of general sessions for Richland County in September, 1945, and by a verdict of the jury was found guilty of murder, with recommendation to mercy. His punishment was fixed under the law at imprisonment in the state penitentiary for life.

From the judgment of that court and from the order denying his motion for a directed verdict, made at the close of the testimony offered in behalf of the state, and from the order refusing his motion for a judgment of acquittal *non obstante veredicto,* he appeals to this court.

The defendant offered no testimony. His contention on trial, and now, is that the state failed to prove the *corpus delicti.* Here the fact of death is not questioned, but it is argued that there was no evidence going to show that the appellant committed the crime charged. It is earnestly pressed upon our attention by counsel for appellant that there is a total failure of evidence from which it may be inferred that the accused knew that the sodium seconal was

a deadly poison when he administered it to his wife. It cannot be doubted that unless the state produced some competent evidence, direct or circumstantial, tending to show that the appellant willfully and feloniously administered to his wife the sodium seconal, knowing its deadly properties, the jury should have been directed to find him not guilty of murder. In this case, the proof offered by the state was confined almost entirely to circumstantial evidence.

■■ In proving *corpus delicti,* the law demands the best proof which in the nature of the case is attainable. Direct and positive evidence is not essential. It is now well established that the elements constituting the *corpus delicti* in a homicide case—the death of the person whose life is alleged to have been taken feloniously, and the criminal agency of another in taking the life of such person—may be sufficiently proved by presumptive or circumstantial evidence, where that is the best evidence obtainable. *State v. Thomas,* 159 S. C., 76, 156 S. E., 169; *State v. Gillis,* 73 S. C., 318, 53 S. E., 487, 5 L. R. A. (N. S.), 571, 114 Am. St. Rep., 95, 6 Ann. Cas., 993.

■ If there is no proof of the *corpus delicti,* the defendant is entitled as a matter of law to a directed verdict. *State v. Brown,* 103 S. C., 437, 88 S. E., 21, L. R. A., 1916-D, 1295. It is generally recognized, however, that in cases of felonious homicide by poisoning, the cause of death can rarely be proved by direct evidence, and the proof of it by circumstantial evidence is often attended by peculiar difficulties. *People v. Harris* (N. Y.), 33 N. E., 65; Annotation, 78 Am. Dec., 256.

■ A careful reading and analysis of the evidence contained in this voluminous record leads to the inevitable conclusion that the trial judge committed no error in overruling the motion for a directed verdict and submitting this case to the jury.

Mary Lee Williams and the defendant, Epes, were married on September 5, 1940, at the home of her parents in

Jacksonville, Florida. Following the outbreak of World War II, appellant was inducted into the armed forces and later attained the rank of lieutenant. He served in an ambulance company connected with a medical administration detachment, which, among other duties, had to do with the removal of the dead and wounded from combat areas. In the course of his service he was ordered to various military posts in the United States, among them Louisiana and South Carolina. Because of his frequent change of base and the wartime difficulty in obtaining living quarters, the defendant and his wife, Mary Lee, were separated a great deal of the time during their married life.

On January 3, 1945, Epes was transferred to Fort Jackson, near Columbia, and from there proceeded to Jacksonville where his wife was teaching, to bring her to Columbia, where he had obtained a small apartment on Sims Avenue. In this apartment, consisting of one small bedroom, bath, and kitchenette, the accused and his wife set up housekeeping on January 18, 1945. The appellant owned an automobile, a coupe, and drove to Fort Jackson each morning to attend to his duties, and returned at the close of the day's work.

On Monday night, January 29th, about eleven o'clock, he went to the police station in the city of Columbia and reported that his wife was missing. He stated to the officers that at 7:30 o'clock that morning he had driven his wife to Main Street in Columbia; that she alighted in front of Harvey's Cafeteria to get breakfast, and later to do some shopping; that he proceeded to Fort Jackson. Upon his return to the apartment that evening, she was not there, and he inquired of Dr. and Mrs. Ferguson, who occupied an apartment across the hall, if they had seen her. They had not seen her that day, so could not give him any information concerning her whereabouts. The police officers, after gaining from him all the information they could obtain, commenced a vigorous investigation and search, which continued unabated until February 12th. During this time they

followed various clues, together with the sheriff and his deputies, offered rewards, broadcast appeals over the radio; and mailed circulars containing Mary Lee's description and the date of her disappearance to police officers in various states of the union. They consulted with the appellant almost daily, and he was in touch with them constantly, and ostensibly cooperated with them.

Two days after Mary Lee's disappearance, her parents, Mr. and Mrs. Williams, came to Columbia from their home in Jacksonville, and occupied the small apartment on Sims Avenue. After their arrival, Lt. Epes slept at Fort Jackson or elsewhere, but was on the most friendly terms with them, and they frequently ate together in the apartment.

On February 12th, or earlier, as appears from the record, the police officers and detectives, and officers from the Provost Marshal's office at Fort Jackson, suspected the criminal agency of the appellant in the disappearance of his wife, and on that day they questioned him for several hours. Until this time he had shown unbroken composure—in fact, one of the things which directed the attention of the officers to appellant was his consistent calm, absence of all nervousness, and his failure to exhibit any emotion during their investigation of his wife's disappearance.

Some time prior to the 12th they had discovered that he had, during October, November, and December, 1944, spent several week ends with a young woman in Louisiana; at Lake Charles and in the city of New Orleans. In New Orleans they had registered at a hotel as man and wife.

During the lengthy conference referred to on February 12th, one officer after another questioned him; his calm continued unshaken until they mentioned the name of this young woman, and then for the first time he showed nervousness. He told the officers that he would be ruined if this disclosure was made public and the name of the young woman brought into the affair. When this interrogation ended, late in the afternoon of the 12th, appellant,

who had been bitten by a dog a day or two before, returned to the hospital at Fort Jackson where he was being given anti-rabies treatment; but as to this he had previously told Mrs. Williams, his wife's mother, that he believed his being placed in the hospital was a pretence; that he feared that the officers would have him psychoanalyzed.

On the next morning, February 13th, appellant attempted to commit suicide. He slashed both wrists, and cut a deep gash in his throat. When his condition was discovered, about eight o'clock a. m., he had lost a great deal of blood, and the medical testimony shows that death would have resulted if he had not received prompt treatment. He was given several blood transfusions and was soon revived, and his wounds treated and dressed. On that morning four letters were discovered near the bunk he occupied in the hospital ward, which had been written by him just prior to his attempted suicide. Although no charge of any kind had been made against him at that time, these letters show that he knew that he was under suspicion.

In his letter to Mr. and Mrs. Williams, his wife's parents, he asserted his innocence, but states: "Although I did not commit any crime they (the officers) say they can disprove my statements." It may be inferred that these letters were designed as self-serving declaration. They deny guilt, but the court and the jury were at liberty, in connection with other circumstances, to infer guilt from them.

The letter written to his father and mother specifically denies that he had any connection with Mary Lee's "vanishing." In the letter addressed to his wife's parents he stated that he had nothing to do with his wife's disappearance, despite the police investigation.

In the third letter, addressed to Major Gaines, Provost Marshal, who was active in the investigation, the appellant reiterated with reference to his wife's disappearance, "I have had no connection with the whole matter."

The fourth letter was addressed to the young woman in Louisiana. He told her that the police had found out "about my knowing you." "I can't cause you any disgrace and scandal, nor can I bring that upon my family, so I am taking the coward's way out." He assured her "in all truth" that he had had nothing to do with Mary Lee's disappearance. The last paragraph of this letter reads as follows:

"I am sorry this thing had to happen—God only knows I did not want it that way. I'd give anything to have it differently but it could not be. Have no pain about this, it was not your fault and none of your doing. Get some good man worthy of you and take my blessing for happiness, and remember that I loved you."

These letters were supposed to contain his last words on earth, and might, therefore, be presumed to express the truth. However, on the very next day (February 14th), after the doctors had revived him, he proved by his own actions and statements that the assertion he made in the letters with reference to the disappearance of his wife, were entirely false. On the 14th, he told the officers where he had buried his wife, and accompanied and directed them to the site of her grave in a secluded spot near the Leesburg Road on the Fort Jackson reservation. It might be argued that if he spoke falsely in these letters, he might also have spoken falsely when he denied any felonious connection with his wife's death.

In guiding the officers to the grave of his wife, in the late afternoon of February 14th, the appellant had difficulty in locating the exact spot where he had buried his wife's body. He told them to drive him back to a certain point, and then return a distance on the Leesburg Road of exactly nine-tenths of a mile. This was done, and he led them to the site of the grave, a little over 100 feet from the road in a wooded area. The body had been interred in one of the many foxholes on the Fort Jackson reservation which had been used in practice maneuvers. It later developed from appellant's statement, that he returned to the grave the day

after he buried the body of Mary Lee, and had placed thereon a sign made by him, the words "Latrine Closed"—the inference being that this spot had been used as a latrine, and no one would dig or excavate where a latrine had been located.

The body was disinterred in his presence and taken to the morgue at Fort Jackson where a post-mortem examination was made by Dr. Vass, the pathologist in charge. When the body was taken from the shallow foxhole, it was found to be in a remarkable state of preservation, due to the prevailing cold weather, although nothing protected it from the earth which covered it except the clothes she wore. She was fully clothed, with shoes on, and with rings on her fingers and other personal jewelry. The autopsy revealed no external bruises or injuries, except that the tight strap of the right shoe had discolored the top of the foot. The brain, kidneys, liver, and the contents of the stomach were removed, securely sealed, and sent to Atlanta for chemical analysis. According to the medical testimony, on a calculation made from an analysis of these organs, the body of Mary Lee contained a minimum of twenty grains of sodium seconal, and a maximum of thirty-two grains, which was a sufficient quantity of the poison to cause death. It was further shown that twenty grains would be approximately thirteen capsules of one and one-half grains each.

On the day following his attempted suicide, the accused made a voluntary written statement in the hospital, which he dictated himself in the presence of Lieutenant Colonel Rompf, a psychiatrist who had supervision of the ward where he was a patient; General Richart, the Commanding Officer of Fort Jackson, and certain police officers. This statement was reduced to writing and signed by him and consisted of a narration of events leading up to the death of his wife and the subsequent concealment and burial of her body. This statement reads as follows:

"I, Samuel C. Epes, 02 048 902, 2nd Lt., MAC, having had explained to me my rights as set forth in Court

Martial Manual and understanding that any statement I may make may be used against me, desire to make the following statement. This statement is made of my own free will and accord. I have not been threatened. I have not had any promises of immunity made me but the entire statement is made in order that I may clear up a matter and that I may get off my mind various things that have been on it for over two weeks.

"First of all; I did not kill my wife; Mary Lee—that's my wife, was menstruating, as has been set forth—was very sick, upset from this condition. She had in her possession sodium seconal which had been given me for this purpose by an army surgeon. We came home Saturday night around 10 to 10:30, approximately, I don't know about it exactly. We had a couple of drinks, not getting intoxicated however and Mary Lee took a couple capsules of sodium seconal. This didn't seem to relieve her pain and discomfort and some time during the course of the evening, I believe she took about 10—about 10. I didn't give them to her. She never used medicine to excess before. Her pulse, I found later, stopped—ceased to beat rather—and she stopped breathing. I was panic-stricken, you might say. I didn't know what to do. I took her out, put the body about a mile outside of camp. I almost went out of my mind. I visited the scene once later to try to summon courage to recover the body and give it proper burial but I couldn't and realized then for the first time what a fool I had been and the position I found myself in. And that's about all. I didn't have guts enough to tell this sooner, as I should have. And that's all. And are there any questions, Major? General, anything you have to say? I didn't call a doctor although I realized later that I should have because I realized that Mary Lee was dead and could only see the position in which I was placed, having her found that way. I am not doing this to alleviate any punishment for myself. I am just trying to save my family and my wife's family blame and publicity and notoriety. I don't care what happens to me."

Late that afternoon a warrant was issued for his arrest for the murder of Mary Lee Epes, and he was taken to the state penitentiary and confined in the penitentiary hospital. The next day, on his own volition, he sent for the Provost Marshal at Fort Jackson, and voluntarily dictated a second statement, in the presence of Major Gaines, the Provost Marshal and other officers, which was reduced to writing and signed by him. He made this statement, he said, to amplify and further explain some details concerning the death of his wife, Mary Lee Epes. This second statement is as follows:

"As previously stated her death was caused by an overdose of sodium seconal, which had been prescribed for relief of menstrual pains. We returned home that Saturday night about 10:30, after having been to downtown Columbia. I gave her two capsules of sodium seconal for relief of her pain as she was menstruating at the time, and fixed a drink for her and myself, hoping that this would help in the relief of her pain as it usually does. Later on, about thirty (30) or forty (40) minutes later, she took one (1) or two (2) more of the sodium seconal capsules with water, having had no relief from the first dose. Later on in the evening, I prepared another drink for each of us, but neither became intoxicated. She either reached and took them or I handed her two (2) more sodium seconal capsules about 11:30 and about midnight, I gave her two (2) more capsules; each time they were taken with water. She still had the stomach pains, and I folded the sofa down and we both laid down. After we were on the sofa, I got a glass of water and I brought her two (2) more sodium seconal capsules, which she took, this being about 12:30. Subsequently to 12:30, we both went to sleep and I was awakened later on by Mary Lee struggling somewhat and vomiting. I got a towel and washed her face off and noted that her pulse was absent and that there was no respiration. Frankly, I was out of my head at this point and didn't know what to do; I apparently did not have sense enough to do the right thing. I had not planned for this to happen; I should

have had sense enough to know the danger of this drug. Nevertheless, I was panic stricken and out of my head, afraid to take Mary Lee to a doctor as I should have done, and I could see only one thing—the danger of my being charged with malpractice and administering drugs, even though I am not a doctor. Some time later, I picked Mary Lee up, and I had some difficulty in managing her. I put a blanket around her, and put her in the back compartment of our car. Prior to this, even though panic-stricken, I had made several tests to see if Mary Lee was actually alivè or not and to me there were no signs of life—no pulse and no heart beat or respiration. The body was cold and limp. After putting her in the back of the car I spread the blanket over her and proceeded (still possibly out of my head) to get rid of the body in some way. I drove down toward Devine Street and realizing that the body would be seen in the back of the car, I stopped on a dark street in front of a church, and transferred Mary Lee to the trunk of the car. In so doing it was necessary to lay the body down on the street and then pick it up and transfer it to the trunk of the car. I mention this fact, because the newspaper accounts state that Mary Lee's head was bruised and I didn't have any connection with this. The bruise could only have occurred as a result of picking her up in the apartment, carrying her down the stairs, and transferring her from the back of the car to the trunk. I proceeded out Devine Street, entered Fort Jackson through Outpost No. 1, and proceeded to the site where I put Mary Lee's body. I wish to explain why I put Mary Lee at this location. Having been at Fort Jackson only a little while, I knew nothing about the surrounding terrain, but I had been on the Leesburg Road on a night problem before, and knew that it would be possible to put Mary Lee there. On my way through camp, I had picked up a shovel and would have used it to prepare a place for the body, but instead I stumbled upon foxholes and I put Mary Lee into one of these, straightened her arms and legs out in a natural position— arms straightened down by the side of the body in a natural

position, and she was lying on her back. After filling the hole I spread some branches over the area. I was so wrought up and nervous that I could not say exactly what hour this was completed, but upon returning I left the shovel at the dispensary of the 665th Clearing Co., and went into the dispensary to get some belladonna for my heaving stomach, and went home through Outpost No. 1 to Devine Street. When I came out of the dispensary a guard passed me, but did not challenge me. At the dispensary I spoke to the ambulance driver on duty, but the CQ was asleep, and the ambulance driver was half asleep. I brought the blanket back to the house. When I got back to the house it was around four o'clock or later. I was weak and, had to lie down for a while. About 8:30 or 9:00, Sunday, I got up and as the blanket had become soiled when Mary Lee vomited, I cleaned it up and hung it out to dry. Later on I cleaned up the glasses and did not eat anything this day, except some ice cream I had. I could not eat. At some hour that night I went to bed, not even folding the bed down, and I arose the next morning (Monday) actually at about 7:05. During the night I realized what a jam I was in and that is when I made up the story I told Monday morning. I actually came down by that restaurant, went to the Post and God only knows what a day I had trying to appear calm and knowing what I had done or what I had not done and what I should have done. Monday night at 8:00 I returned to our apartment, having taught a 6:30 class, and then proceeded with the fabrication which I planned to tell the police. Then I realized what a position I found myself in and it was Monday night that I threw away Mary Lee's large grey purse, hoping it would bear out the story I told the police about her disappearance. About 1:00 that night, I went to bed, not sleeping much.

"I want to say again that I did not plan this, but Mary Lee, I know died, and I went out of my head temporarily perhaps, and did not know what to do, and took this awful course. I did not kill her; I did not mean to. I am not guilty of killing her but I am guilty of secreting the body in a

moment of weakness and of not being man enough to come forward with information as to its whereabouts sooner than I did."

■ It may readily be inferred that these written statements were deliberately designed as self-serving and self-exculpatory. They deny guilt, but the trial judge and the jury were justified in drawing an inference of guilt from them. It is clear that these statements are not confessions.

■ A confession in a legal sense is restricted to an acknowledgment of guilt made by a person after an offense has been committed and does not apply to a mere statement or declaration of an independent fact or facts from which such guilt might be in inferred. *State v. Pittman,* 137 S. C., 75, 134 S. E., 514; *State v. Knight,* 118 S. C., 99, 109 S. E., 803; 22 C. J. S., Sec. 730, page 1243.

In *State v. Turner,* 117 S. C., 470, 109 S. E., 119, a homicide case, it was held that the *corpus delicti* was not proved and that the trial judge erred in not directing a verdict of not guilty, because as was there said:

"The State failed to connect him with the actual killing or that he was present aiding and abetting at the time of the killing, or that he had anything to do with it at all, until after the killing occurred, and his conduct after the homicide cannot convict him of an offense that the state failed to prove."

But in the case at bar, there is ample evidence without exaggerating facts or drawing rash inference, tending to prove the criminal agency of the appellant, which we will hereafter advert to—even without the aid of the inferences which may be drawn from his action in concealing the body and the evidence of the crime.

It was further held in *State v. Turner, supra,* that any statement made by the defendant, even though he did not admit the commission of the crime, is competent as against the party making it if it throws any light on the subject being tried and elucidates the subject-matter of the trial.

In this case it is conceded that Mary Lee Epes was menstruating at the time of her death. Her father and mother testified that on such occasions she never suffered any unusual pain or physical discomfort. Nor did she ever take drugs to relieve this condition. On the contrary they stated that she was averse to the use of drugs. And this testimony finds some confirmation in the first of the written statements made by the appellant (wherein he denied that he administered the drug), where he said, "she never used medicine to excess before".

The proof of the defendant's criminal agency largely depends in the first place upon the medical testimony, because apparently the question of suicide is not involved. If the medical testimony is to be believed—and the jury evidently believed it—a sufficient quantity of sodium seconal was found in the body of the deceased to bring on death. The medical testimony tends to further show that there are five progressive effects on the physical system from the taking of successive doses of sodium seconal at definitely spaced intervals: relief of pain, drowsy or hypnotic stage, anesthesia, coma and death. And that this poison chiefly affects the respiratory mechanism. As the amount taken is proportionately increased, respiration becomes slower and slower until breathing stops and death ensues. The defendant stated in the second of his written statements that his wife had taken ten capsules of sodium seconal, and that he gave her the first two and the last six capsules. All of these capsules were administered within the space of two hours— that is, between 10:30 o'clock P. M., January 27th and 12:30 o'clock A. M., January 28th.

Dr. R. P. Walton, professor of Pharmacology at the Medical College of South Carolina, testified in detail upon the use and effect of the poisonous drug, sodium seconal, which is ordinarily prescribed as a sedative or sleep inducing drug. The deceased was a normal young woman, twenty-six years old, in good health, and weighed ninety-eight

pounds; and his testimony was given with her physical status in mind.

Dr. Walton said that after taking two capsules of sodium seconal with a drink of whiskey, she would have some tendency to sleep and ordinarily should be free of pain. That if given, after a half-hour, one or two more capsules of sodium seconal with water, she would then be noticeably sleepy, and from his knowledge of medicine she would have been entirely free from pain. That if after another half-hour she were given two more capsules of sodium seconal with another drink of whiskey, she would enter a deep sleep, and in such condition would be unable to take any more on her own volition, although she would be able to swallow if aroused. That if a half-hour later she were given two more capsules, amounting to eight in all, it would result in anesthesia, a condition in which there would be no muscular tone of the voluntary muscles; there would be no pain, nor would there be consciousness. And the doctor testified that if thereafter, within another half-hour, she were given two more capsules, it would result in deep anesthesia, where she could be operated upon surgically. Dr. Talbert, a practicing physician of Columbia, gave substantially the same testimony.

The testimony is easily susceptible of the inference that appellant was not ignorant of the use and effect of drugs. Not only was a box of sodium seconal capsules found in his apartment labeled in his own handwriting "Take 1-2 for menstrual nervousness and pain. Sodium Seconal:", but when his automobile was searched other drugs and boxes of pills were discovered. It will be recalled that he was a motor officer with a medical administration detachment.

Eighteen letters written by him to the young woman in Louisiana were introduced in evidence, as were letters written by him to his wife. In many of these letters his familiarity with drugs and a penchant for their use are clearly exhibited. This is shown by the following references which he

makes himself to his medical and surgical experience, found in these various letters: "I seem designed to be a doctor * * * once again I'll pass out the medicine". "Capt. Leistyna left on emergency leave yesterday, so once again I'm doc and C. O. of the detachment". "Today I made a total of four lectures on malarial control". "Did a minor operation for a cyst in a man's neck yesterday—patient doing nicely". "Made five lectures on V. D." "Captain Leistyna got a two weeks' extension on his leave so I'll be in command of the medical section. Hope I don't have too many compound fractures, etc." * * * "Today I had two black eyes and one mashed head to attend to". "Never a dull moment—I just removed a sebaceous cyst from a man's throat, and before I finished I had to incise and remove a chunk of steel from a soldier's chest". I did a neat operation yesterday and removed a carbuncle and cyst from a man's neck; said it didn't hurt him—much".

The evidence further tends to show that appellant had a strong propensity for the prescribing of drugs. For the benefit of his wife and for the young woman in Louisiana, two letters contain what purport to be formal prescriptions; and in one letter to this young woman he writes: "By the way, your Benzedrine Sulphate is on its way to you". When questioned by the officers on the day before his attempted suicide, he stated that he prescribed and gave drugs to soldiers, especially when no doctors were available.

Under the medical testimony and the facts and circumstances referred to, the jury were fully warranted in drawing an inference of felonious intent on the part of the appellant in administering to his wife the sodium seconal capsules. The doctors testified that the deceased after taking six capsules would not only be free from pain but would be in a state of anesthesia, and that the chemical analysis tended to show that she had been given at least twenty (20) grains. It will be recalled, too, that appellant knew that only one to two sodium seconal capsules should be given for menstrual pains. He wrote this direction himself on the box contain-

ing them. And he promptly reached the conclusion, before it was so determined by the chemical analysis, that his wife died from taking an excessive amount of sodium seconal.

■ The general rule is that the concealment or the attempted destruction of a body of a person murdered is regarded as an incriminating circumstance and will be given probative force in connection with other facts. See Annotation, 2 A. L. R., 1227, and the numerous cases there cited to sustain this proposition; and also Wigmore on Evidence (2d Ed.), Secs. 32, 172, 267, 272, 276.

■ The action of the appellant in concealing the body of his wife so as to divert suspicion from himself, was a relevant circumstance tending to show guilt, and it was for the jury to estimate its weight, and it was for the jury to determine whether his explanation and the motive he assigned were truthful or otherwise.

The evidence also clearly tends to show that the defendant, on the night his wife died, was not intoxicated or unduly excited. The jury could draw the inference that no man with a clouded brain could have disposed of the body and have covered his tracks as deliberately and as methodically as was done by the accused. As soon as he had satisfied himself that his wife was dead, he proceeded, despite his oft repeated statements of fright and panic, to dispose of the body, in such manner and with such precision of method, and seemingly with such fore-knowledge of destination, and with such dispatch and expedition as to indicate that it was something that he had premeditated and determined upon before hand. It can reasonably be inferred that no time for reflection was needed, and consequently no hesitation about what he would do, because all of the thinking and deliberating had already been done.

As tending to show premeditation, the testimony discloses that when appellant presumably, at one o'clock a. m., on January 28th, wrapped a blanket around his wife and carried her in darkness and secrecy down the winding stair-

case of his second floor apartment and placed her in his automobile parked in the street, he apparently pursued an undeviating course to the secluded spot on the Fort Jackson Reservation, where he buried her—several miles from Columbia. He explains this in his second written statement by saying that he had been stationed at Fort Jackson only a little while and knew nothing about the surrounding terrain; but that he had been on the Leesburg Road before on a night problem, and knew that it would be possible to put Mary Lee there.

In spite of the distance he had to travel and all that he had to do in the burial of the body, he stated that he was back at his apartment about four o'clock in the morning. Following the burial, and before he reported to the police two days later the disappearance of his wife, he attempted to eradicate every trace of her death in the apartment. He brought back with him from the grave the blanket in which his wife's body had been wrapped, and washed it, because, he said, when Mary Lee vomited a moment before her death and awakened him the blanket had become soiled. The medical testimony tends to show that at that stage of anesthesia or coma there would have been no vomiting. The jury could reasonably have inferred that the blanket became soiled when he placed his wife in the trunk of his automobile.

Other significant and incriminating circumstances might be mentioned: Although Mrs. Epes was supposed to have been, according to appellant's written statement, in great pain for several hours, she was never disrobed for bed; nor, apparently, did she ever lie down until after eight of the capsules had been taken. According to the medical testimony, she would then have been in a deep anesthesia. As stated, when her body was recovered, she was fully clothed and shod. Although Dr. Ferguson, a medical doctor stationed at Fort Jackson, occupied an apartment just across the hall from appellant, he was never called to attend Mary Lee in her supposed illness or to verify her death.

It seems unnecessary to unduly prolong this opinion by further reference to the evidence, but one additional circumstance might be referred to: The record does not contain, nor do the suicide letters, nor the two written statements of appellant, any expression of regret or sorrow on his part on account of the death of his wife. Not the slightest evidence of grief or any sense of personal loss was manifested, although it may be inferred from the letters in evidence, written by him to his wife and from the testimony of his wife's parents, that during her lifetime he expressed affection for her, and was apparently happily married.

We are not concerned in this case with the weight and effect of the evidence or the credibility of the witnesses. These things are within the province of the jury. It is for us to determine solely whether there was sufficient evidence to go to the jury tending to prove the *corpus delicti* or criminal agency of the accused beyond a reasonable doubt.

■ Much has been said in the arguments of counsel concerning the nature, weight and character of circumstantial evidence. But all that we should require of circumstantial evidence is that there shall be positive proof of the facts from which the inference of guilt is to be drawn, and that that inference is the only one which could reasonably be drawn from the facts. All the circumstances taken together must point in the direction of guilt to a moral certainty to the exclusion of any other reasonable hypothesis. *State v. Kimbrell,* 191 S. C., 238, 4 S. E. (2d), 121.

In the case of *People v. Harris* (N. Y.), 33 N. E., 65, the defendant was charged with the murder of his wife by poisoning, and the evidence connecting the accused with the commission of the crime charged was wholly circumstantial. The trial resulted in a conviction of murder. Upon appeal the judgment was affirmed. The discussion by the court on the law and the evidence is so pertinent to the facts and inferences in the case at bar that we quote from that opinion:

"Evidence, as I have suggested, is not to be discredited because circumstantial. It has often more reliable elements than direct evidence. Where it points irresistibly and exclusively to the commission by the defendant of the crime, a verdict of guilty may rest upon a surer basis than when rendered upon the testimony of eye witnesses, whose memory must be relied upon, and whose passions or prejudices may have influenced their testimony. If, taken together, it leads to a conclusion of guilt with which no material fact is at variance, it constitutes the higher form of evidence which the law demands where the life or the liberty of the defendant is at stake, and neither jurors nor the court can conscientiously disregard it. Nor can I think that the conclusion of guilt is unduly influenced by the unusual depravity of nature which the evidence exhibits in the defendant. The evidence seems to overwhelm the accused with his guilt, and leaves the mind unfitted to accept any other belief than that he intended to make away with his wife in order to free the field of his own life, and to escape from the imminent danger of disgrace or punishment, and that with cold deliberation he planned her death by methods which should conceal him as its author. The circumstances preceding and attendant upon the death of the deceased were such as to associate him inevitably with its cause, and to forge the chain which has drawn him to the bar of justice."

In *State v. Roddey,* 126 S. C., 499, 120 S. E., 359, where the defendant was convicted of grand larceny upon circumstantial evidence, the court had this to say:

"Appellant's legal position is that the evidence was circumstantial and that the circumstances relied upon to establish guilt 'did not measure up to the requirements of the law, in that the same could have been true, and yet the defendant could have been innocent'. That position is untenable. Whether the evidence adduced fulfills the requirement of the rule of evidence that all of the facts and circumstances must be consistent with the guilt of the accused, and in-

consistent with his innocence, is a question that goes to the weight of the evidence, and is clearly for the determination of the jury, as the triers of the facts, under appropriate instructions of the court.

"Under the well settled rule, unless there was a total failure of competent evidence tending to establish the charge laid in the indictment, the trial court's rulings upon motions of this character may not be impeached for error of law, the only class of errors which in a law case this court has power to correct."

In *State v. Brown,* 205 S. C., 514, 32 S. E. (2d), 825, the court discussed the sufficiency of the evidence which would warrant the submission of the case to the jury, and there said:

"The general rule is that, if there be any evidence tending to prove the fact in issue, or which reasonably conduces to its conclusion as a fairly logical and legitimate deduction and not merely such as raises a suspicion or conjecture in regard to it, the case should be submitted to the jury. *State v. Roddey,* 126 S. C., 499, 120 S. E., 359; *State v. Villepigue,* 127 S. C., 392, 121 S. E., 258; *State v. Walker,* 138 S. C., 293, 136 S. E., 215."

It must also be kept in mind that on an appeal from the refusal of the court to direct a verdict, the evidence and the inferences which may reasonably be drawn therefrom, must be viewed in the most favorable light for the state. *State v. Brown,* 205 S. C., 514, 32 S. E. (2d), 825; *State v. Turner,* 117 S. C., 470, 108 S. E., 119; *State v. Quinn,* 111 S. C., 174, 97 S. C., 62, 3 A. L. R., 1500.

After a painstaking examination of all of the evidence contained in this extensive record, and the inferences which may legitimately be drawn therefrom, we think there can be no doubt that the court committed no error in submitting the case to the jury on the issue of felonious homicide. It was for the jury to say whether the appellant intended to

murder his wife when he administered to her the sodium seconal.

There is one further question. In this case the trial judge ably and at length charged the jury on every applicable phase of the law relating to murder, and there is no exception to any portion of his charge. But the appellant argues, as he did in his motion for a new trial, that the court erred in failing to charge the law of involuntary manslaughter.

On the trial of the case, after all of the state's testimony had been introduced, and while the chief defense counsel was reading to the court certain requests to charge, the following took place:

"The Court: Do you want me to carge the jury on the issue of manslaughter and involuntary manslaughter?

"Mr. Brown: No, sir, I don't think that's an issue in the case. Counsel has said that there is a possibility of the statute about criminal negligence being involved in this case, but I don't think so. On the question of simple manslaughter where there was provocation, I don't think there could possibly be that in this case, and I think your Honor should charge the jury that he is either guilty of a deadly, intentional, plain, criminal murder, or that he is not guilty. Now, only by the wildest stretch of the imagination can you say that a man ought to watch his wife every time she takes a pill or every time my wife takes an anodyne.

"The Court: Unless you wish to argue to the jury along that line, I am not going to charge the jury that. I agree with you."

It is now contended that possibly there was evidence in the case from which the jury might reasonably have drawn the inference that the defendant was guilty of involuntary manslaughter—that is, a negligent killing in the performance of a lawful act.

When appellant's attorney made to the court the statement quoted—that there was no issue of involuntary man-

slaughter involved in the case—he knew all of the facts upon which the state relied for conviction, and it may well be that counsel concluded that the accused would derive a distinct advantage from the failure of the court to charge on a lesser degree of homicide. It can readily be inferred that defense counsel considered that the evidence offered by the state to prove the charge of murder was weak, unsatisfactory, and lacking in probative force, and that if left to the two extremes the jury would be most likely to render a verdict of not guilty, rather than a verdict of murder.

It is plain that appellant by his counsel, expressly waived any right he might have had, to an instruction on the law of involuntary manslaughter.

■ A defendant charged with murder cannot complain of the court's failure to charge on a lesser degree of homicide, or upon a particular theory, when his counsel, in response to a question addressed to him by the court, stated unequivocally that he did not desire an instruction on such theory. A party cannot complain of an error which his own conduct has induced. *Brown v. State,* 71 Ga. App., 522, 31 S. E. (2d), 85; *Threlkeld v. State,* 128 Ga., 660, 58 S. E., 49; *Day v. State,* 199 Ala., 278, 74 Sou., 352; *People v. LeMorte,* 289 Ill., 11, 124 N. E., 301.

In the case of *State v. Vaughn,* 95 S. C., 455, 79 S. E., 312 (1913), judgment affirmed (1915) *Vaughn v. State of South Carolina,* 35 S. Ct., 940, 238 U. S., 612, 59 L. Ed., 1489, the appellant was tried for the crime of rape. He pleaded not guilty but after the trial had begun he changed his plea, through his attorney, to guilty and agreed that the only issue to submit to the jury was whether or not he was entitled to recommendation of mercy. The jury failed to recommend mercy and the defendant appealed on the ground that it was improper for the court to accept this plea of guilty when it did not come from the defendant personally and when his testimony showed that he was not guilty. He further cited error because the trial judge failed to advise

the defendant of the nature and consequences of his plea and did not make it affirmatively appear that his plea was involuntary as the law required in capital cases. This court found against the appellant and quoted the following from Herman on Estoppel and Res Judicata, Vol. 2, Page 934:

"Waiver is voluntary, and implies an election to dispense with something of value, or forego some advantage, which the party waiving it might at his option have demanded or insisted upon. A waiver takes place when a man dispenses with the performance of something that he has a right to exact. A party may waive a constitutional as well as a statutory provision for his benefit, * * * and when waived by such party, he will be estopped from setting them up or claiming them."

Further comment on the enormity of the offense here involved would serve no useful purpose. The facts and inferences were primarily and essentially for determination by the jury. We can but conclude that there was no error in the trial of the case.

Judgment affirmed.

MESSRS. ASSOCIATE JUSTICES STUKES, TAYLOR and OXNER concur. MR. CHIEF JUSTICE BAKER dissents.

MR. CHIEF JUSTICE BAKER (dissenting): At the September, 1945, term of the Court of General Sessions for Richland County, Samuel C. Epes, the appellant, was tried on an indictment charging him with the murder of his wife, Mary Lee Epes, on January 28, 1945. The appellant offered no testimony, and at the conclusion of the testimony for the State he moved for a directed verdict, which motion was refused. The case having been submitted to the jury, a verdict of guilty of murder with recommendation to mercy was returned. A motion for new trial or judgment of acquittal *non obstante veredicto* was made and refused, and from a sentence to life imprisonment the case has been appealed to this Court.

The substance of the reasons assigned for reversal of the judgment of the Circuit Court may be thus stated: (1) the evidence was insufficient to sustain a conviction of any offenses; (2) if the evidence was sufficient to sustain any conviction at all, it was insufficient to sustain a conviction of any greater offense than involuntary manslaughter; (3) if the testimony required submission of the case to the jury, the trial Judge committed error in failing to charge on the law of involuntary manslaughter.

The appellant, a resident of Richmond, Va., then a student at Richmond University, and Mary Lee Williams, a resident of Jacksonville, Fla., then a student at the Richmond Division of William and Mary College, met and were subsequently married in Jacksonville on September 5, 1940. No children were born to this union. Following the outbreak of the recent war appellant enlisted in the army, and he later rose to the rank of Lieutenant in the ambulance corps. At the time of his wife's death he was motor officer of an ambulance company stationed at Fort Jackson, S. C.

In the course of his training for overseas duty, the appellant was stationed at various army camps in this country. A small part of the time his wife was with him, the remainder of her time being spent with her parents in Jacksonville, Fla., where she was a part-time teacher in the public schools. In January, 1945, she joined her husband (the appellant) in Columbia following his assignment to duty at Fort Jackson. They moved into a small apartment in Columbia and did light house-keeping. The appellant commuted between Fort Jackson and Columbia, spending his days at the fort and his nights in the city.

The relations of this young couple at all times seem to have been cordial and affectionate, and so far as the testimony discloses there was never the slightest quarrel or disagreement between them during their entire married life. Mr. T. G. Williams, the father of Mrs. Epes, in referring to an inquiry by the police of the City of Columbia, testi-

fied: "It seemed that they felt at that time that it was probably a triangle, or something, or a fuss, and she had gone off, and we assured them then, Mrs. Williams and myself assured them that there was nothing of the kind; that to our knowledge the married life of our daughter and Sam Epes had been most happy". Also the letters of the appellant to Mrs. Epes introduced in testimony are unusually affectionate in their expressions.

While they were alone in their little apartment in Columbia on the night of January 28-29, 1945, tragedy intruded, leaving Mary Lee Epes dead and her husband, the appellant, now charged with her murder.

During the next day, January 29, 1945, the appellant kept his own counsel about what had occurred on the preceding night and went about his usual affairs; but on the night of the 29th, he went to the police station in Columbia and reported that his wife was missing. He said that he had left home early that morning to go to Fort Jackson; that on his way he had brought his wife into the city and left her; and that he had not seen her since. Following the receipt of this information from the appellant, the officers of the law prosecuted intensive searches and inquiries, covering a period of approximately two weeks, in which the appellant himself ostensibly participated, but no trace of Mrs. Epes was found. Finally, however, on February 14, 1945, the appellant made a statement to the effect that his wife had died in their apartment on the night of January 28, 1945, as the result of an overdose of sodium seconal, and that in his panic he had carried her body off in his automobile and buried it in a remote part of the Fort Jackson military reservation. He also went with the officers of the law and showed them the place where the body was buried. He made two written statements detailing the circumstances surrounding the death of Mrs. Epes and the disposition of her body.

The first of the written statements (omitting the formal parts) was as follows:

"First of all: I did not kill my wife; Mary Lee—that's my wife, was menstruating, as has been set forth—was very sick, upset from this condition. She had in her possession sodium seconal which had been given me for this purpose by an army surgeon. We came home Saturday night around 10 to 10:30, approximately, I don't know about it exactly. We had a couple of drinks, not getting intoxicated however and Mary Lee took a couple capsules of sodium seconal. This didn't seem to relieve her pain and discomfort and some time during the course of the evening I believe she took about 10—about 10. I didn't give them to her. She never used medicine to excess before. Her pulse, I found later, stopped—ceased to beat rather—and she stopped breathing. I was panic-stricken, you might say. I didn't know what to do. I took her out, put the body about a mile outside of camp. I almost went out of my mind. I visited the scene once later to try to summon courage to recover the body and give it proper burial but I couldn't and realized then for the first time what a fool I had been and the position I found myself in. And that's about all. I didn't have guts enough to tell this sooner, as I should have. And that's all. And are there any questions, Major? General, anything you have to say? I didn't call a doctor although I realized later that I should have because I realized that Mary Lee was dead and could only see the position in which I was placed, having her found that way. I am not doing this to alleviate any punishment for myself. I am just trying to save my family and my wife's family blame and publicity and notoriety. I don't care what happens to me."

The second statement (omitting the formal parts) was as follows:

"I made this statement to amplify and further explain some details heretofore unexplained about the death of my wife, Mrs. Mary Lee Epes, on or about 27 January had not planned any such action.

"As previously stated her death was caused by an overdose of sodium seconal, which had been prescribed for

relief of menstrual pains. We returned home that Saturday night about 10:30, after having been to downtown Columbia. I gave her two capsules of sodium seconal for relief of her pain as she was menstruating at the time, and fixed a drink for her and myself, hoping that this would help in the relief of her pain as it usually does. Later on, about thirty (30) or forty (40) minutes later, she took one (1) or two (2) more of the sodium seconal capsules with water, having had no relief from the first dose. Later on in the evening, I prepared another drink for each of us, but neither became intoxicated. She either reached and took them or I handed her two (2) more sodium seconal capsules about 11:30 and about midnight, I gave her two (2) more capsules; each time they were taken with water. She still had the stomach pains, and I folded the sofa down and we both laid down. After we were on the sofa, I got a glass of water and I brought her two (2) more sodium seconal capsules, which she took, this being about 12:30. Subsequent to 12:30, we both went to sleep and I was awakened later on by Mary Lee struggling somewhat and vomiting. I got a towel and washed her face off and noted that her pulse was absent and that there was no respiration. Frankly, I was out of my head at this point and didn't know what to do; I apparently did not have sense enough to do the right thing. I had not planned for this to happen; I should have had sense enough to know the danger of this drug. Nevertheless, I was panic-stricken and out of my head, afraid to take Mary Lee to a doctor as I should have done, and I could see only one thing —the danger of my being charged with malpractice and administering drugs, even though I am not a doctor. Some time later, I picked Mary Lee up, and I had some difficulty in managing her. I put a blanket around her, and put her in the back compartment of our car. Prior to this, even though panic-stricken, I had made several tests to see if Mary Lee was actually alive or not and to me there were no signs of life—no pulse and no heart beat or respiration. The body was cold and limp. After putting in the back of the car I

spread the blanket over her and proceeded (still possibly out of my head) to get rid of the body in some way. I drove down toward Devine street and realizing that the body would be seen in the back of the car, I stopped on a dark street in front of a church, and transferred Mary Lee to the trunk of the car. In so doing it was necessary to lay the body down on the street and then pick it up and transfer it to the trunk of the car. I mention this fact because the newspaper accounts state that Mary Lee's head was bruised and I didn't have any connection with this. The bruise could only have occurred as a result of picking her up in the apartment, carrying her down the stairs, and transferring her from the back of the car to the trunk. I proceeded out Devine Street, entered Fort Jackson through Outpost No. 1, and proceeded to the site where I put Mary Lee's body. I wish to explain why I put Mary Lee at this location. Having been at Fort Jackson only a little while, I knew nothing about the surrounding terrain, but I had been on the Leesburg Road on a night problem before, and knew that it would be possible to put Mary Lee there. On my way through camp, I picked up a shovel and would have used it to prepare a place for the body, but instead I stumbled upon foxholes and I put Mary Lee into one of these, straightened her arms and legs out in a natural position—arms straightened down by the side of the body in a natural position, and she was lying on her back. After filling in the hole I spread some branches over the area. I was so wrought up and nervous that I could not say exactly what hour this was completed, but upon returning I left the shovel at the dispensary of the 665th Clearing Co., and went into the dispensary to get some belladonna for my heaving stomach, and went home through Outpost No. 1 to Devine St. When I came out of the dispensary a guard passed me, but did not challenge me. At the dispensary I spoke to the ambulance driver on duty, but the CQ was asleep, and the ambulance driver was half asleep. I brought the blanket back to the house. When I got back to the house it was around four o'clock or later. I was weak and

had to lie down for awhile. About 8:30 or 9:00, Sunday, I got up and as the blanket had become soiled when Mary Lee vomited, I cleaned it up and hung it out to dry. Later on I cleaned up the glasses and did not eat anything this day, except some ice cream I had. I could not eat. At some hour that night I went to bed, not even folding the bed down, and I arose the next morning (Monday), actually at about 7:05. During the night I realized what a jam I was in and that is when I made up the story I told Monday morning. I actually came down by that restaurant, went to the Post and God only knows what a day I had trying to appear calm and knowing what I had done or what I had not done and what I should have done. Monday night at 8:00 I returned to our apartment, having taught a 6:30 class, and then proceeded with the fabrication which I planned to tell the police. Then I realized what a position I found myself in and it was Monday night that I threw away Mary Lee's large grey purse, hoping it would bear out the story I told the police about her disappearance. About 1:00 that night I went to bed, not sleeping much.

"I want to say again that I did not plan this, but Mary Lee, I know died, and I went out of my head temporarily perhaps, and did not know what to do, and took this awful course. I did not kill her; I did not mean to. I am not guilty of killing her but I am guilty of secreting the body in a moment of weakness and of not being man enough to come forward with information as to its whereabouts sooner than I did."

"I have read the foregoing statement, consisting of two pages, and find it to be true to the best of my knowledge and belief."

The character of the death of Mrs. Epes, whether felonious or otherwise, necessarily was fixed at the moment of death, and it must be determined by a proper appraisement of events occurring in the apartment preceding her death. Events occurring after the event obviously cannot change

the nature of something already accomplished. The only source of information as to what occurred in the apartment on the fateful night of January 28, 1945, is the appellant himself, and the only evidence produced as to these events consists of his oral statements and his two written statements containing all of the substance of his oral statements.

Examination of the allegations of the indictment under which the appellant has been brought to trial shows that he is charged with bringing about the death of Mary Lee Epes by a combination of two things: (1) administering or causing to be administered to her "a certain drug and poisonous substance commonly called sodium seconal", and (2) suffocating her by placing a blanket or cloth around her head, placing her body in the trunk of an automobile and closing the top thereof, and placing her body in the ground and covering it with dirt. As to the charge of suffocation, it is not claimed that it has any support at all in the testimony, and even if such claim were made it would be quite impossible to sustain it by anything appearing in the record. Waiving the point raised by the appellant that the State is bound by the allegations of its indictment to the extent of having to prove that death resulted from the combination of the two causes alleged, and assuming, without deciding, that it is only necessary to prove one or the other of the alleged causes, we shall examine into the charge of poisoning by means of sodium seconal.

The charge of poisoning is thus expressed in the indictment: " * * * The said Samuel C. Epes her the said Mary Lee Epes, then and there feloniously, willfully and of his malice aforethought did administer to and caused to be administered to and taken by the said Mary Lee Epes, a certain drug and poisonous substance commonly called Sodium Seconal * * *" The appellant being presumed to be innocent of this charge, there can be no doubt that in order to sustain a conviction of murder the State must produce evidence reasonably tending to show that he intentionally administered or caused to be administered to Mary

Lee Epes a dangerous drug, which he knew or had reasonable cause to apprehend was dangerous, in sufficient quantities and at such intervals of time as to endanger her life. We do not think that the State has produced such evidence. As counsel for appellant not inappropriately suggest, not only is there a failure of such proof, but if we impute this much knowledge to the appellant it is more knowledge than the medical profession itself had at the time.

Sodium seconal is one of a class of drugs known as barbiturates, and there are many drugs of this class of varying degrees of potency. The testimony shows that containers in which this drug commonly was being sold did not contain on the labels the word "poison," as is usual in the case of poisonous substances, but merely "Warning, May Be Habit Forming"; and although section 5175, Code of Laws, S. C., 1942 requires all pharmacists, apothecaries or druggists to affix to every bottle, vial, box or other package containing any poison a label, "whereupon shall be either printed or legibly written, with red ink, the name of the poison and the name of at least one antidote, with brief directions as to the mode of using the same", it does not appear that containers of sodium seconal bear labels such as required by this section. This would seem to indicate quite clearly that sodium seconal has not been regarded by the drug profession as a poison at all, much less a death dealing poison.

The testimony of the medical witnesses, some of them allegedly experts on the effects of drugs, is still more convincing. Major Frank L. Milligan of the Medical Corps of the United States Army places sodium seconal in the class with aspirin, and at one place in his testimony, he testified that he had never heard of a case of acute poisoning from the use of sodium seconal until this case. He also stated that prior to September, 1945, several months after the death of Mrs. Epes, he had never read anything to the effect that sodium seconal was an acute poison and had killed anybody. He, however, testified (without giving the

source) that his knowledge of the poison drug in this particular case preceded the publication of the article thereabout (appearing in the medical journal). Dr. R. P. Walton, a Ph.D. in chemistry and an M.D., and at present the Professor of Pharmacology at the South Carolina Medical College, was able to cite from his own medical experience only one case of poisoning in which seconal was involved. That was a case in which eleven capsules, half of seconal and half of pento-barbital, were taken, and the result was not fatal. He also testified that an article in the American Medical Association Journal in 1940 on Barbiturate deaths included only one from sodium seconal, and that the article stated that it was the first recorded case of poisoning by seconal. Dr. S. Watson Talbert, a practicing physician in Columbia for twenty-four years, testified that in his own experience he had known only one death from a barbiturate drug, and his testimony did not identify the drug as sodium seconal.

Although appellant's assignment in the army was that of motor officer in an ambulance company, a service doubtless having some connection with the medical corps, yet his duties in no way involved medicine or surgery, but were chiefly concerned with the transportation of the dead and wounded from battle areas. There is no testimony at all tending to show that he had any special knowledge of the effect of drugs, and consequently his knowledge must be judged by the knowledge reasonably to be attributed to the average man. He cannot fairly be charged with as much or more knowledge than was then possessed by experts and specialists in the field of toxicology. We, therefore, think that the testimony of the State fails in this vital and essential particular.

We have not failed to give careful consideration to the other medical and expert testimony in the case relating to the autopsy, the analysis of the vital organs of Mrs. Epes, and the effect, from a theoretical and hypothetical standpoint, of sodium seconal, but there is nothing in this testi-

mony in any way supplying the fatal deficiency above indicated. Indeed, the testimony of Capt. A. L. Vass of the Army Medical Corps, who performed the autopsy, in some respects persuasively corroborates appellant's version of the tragedy. Capt. Vass testified that there were no marks of external violence on the body, and that he found clear evidence that Mrs. Epes was menstruating at the time of her death, just as the appellant has always said. In this connection Capt. Vass in the report of his autopsy said: "The state of the uterus as described grossly and the state of the ovaries indicate that the deceased was menstruating at the time of her death" (this statement the appellant has told all the time, and if he told the truth about some part, he may be telling the truth about it all).

As we understand the situation, the State does not really claim that it has any direct testimony sufficient to sustain this conviction but it insists that there are certain circumstances disclosed by the testimony inconsistent with any reasonable hypothesis other than appellant's guilt as charged in the indictment, and of sufficient weight to justify the verdict found by the jury. We have carefully weighed all of these circumstances, and while some of them raise a suspicion, and doubtless a strong one, yet we cannot bring ourselves to think that they meet the test of proof by circumstantial evidence thus stated in *State v. Kimbrell,* 191 S. C., 238, 4 S. E. (2d), 121:

"Where it is undertaken by the prosecution in a criminal case to prove the guilt of the accused by circumstantial evidence, not only must the circumstances be proven, but they must point conclusively—that is, to a moral certainty—to the guilt of the accused; they must be wholly and in every particular perfectly consistent with each other, and they must further be absolutely inconsistent with any other reasonable hypothesis than the guilt of the accused. *State v. Langford,* 74 S. C., 460, 55 S. E., 120; *State v. Aughtry,* 49 S. C., 285, 26 S. E., 619; *State v. Hudson,* 66 S. C., 394, 44 S. E., 968.

"Every circumstances which is relied upon by respondent as material must be brought to the test of strict proof. All of the facts proved must be consistent with each other, and, taken together, should be of a conclusive nature and tendency, producing a reasonable and moral certainty that the appellant and no one else committed the offense charged. It is not sufficient that they create a probability, though a strong one; and if, therefore, assuming all the facts to be true, which the evidence tends to establish, they may yet be accounted for upon any hypothesis which does not include the guilt of appellant, then the proof fails. The reason for this is that all presumptions of law, independent of evidence, are in favor of innocence, and every person is presumed to be innocent until he is proved to be guilty. As has often been stated, it is not sufficient to establish a probability of guilt arising from the doctrine of chances that the fact charged is likely to be true."

Although we do not think the circumstances, either singly or all taken together, are inconsistent with any other reasonable hypothesis than the guilt of appellant as charged, yet there are two matters upon which major reliance is placed by the State, as a part of its circumstantial evidence, which seem to require some special consideration.

As a circumstance tending to prove guilt, and also in order to show motive, the State lays much stress upon an alleged affair between the appellant and a young lady in Louisiana during the period when Mrs. Epes was at the home of her parents in Jacksonville, Fla., and the apellant was assigned to duty in Arkansas and Louisiana during the fall of 1944. Without in any respect condoning or attempting to justify this affair, if there actually were any improper relations, yet we cannot fairly assume to suggest that such a thing is so unprecedented, either in time of war or peace, as to be inconsistent with innocence of the charge of murder as made in this case. The cordial relations always previously existing between the appellant and his wife, the affectionate letters written to her by him during the period

that this indiscretion is said to have been in progress, their amicable relations in their little apartment in Columbia, and the statement of Mr. Williams, the father of Mrs. Epes, that the married life of his daughter and Sam Epes had been most happy are quite inconsistent with the idea that the appellant was devising a diabolical scheme to murder his wife in order that he might resume an affair with a woman in Louisiana. If he had desired to be rid of his wife, it is inconceivable that he would have ignored the possibilities of the divorce courts and resorted to such a bungling plan of murder as the use of such a mild and uncertain drug as sodium seconal.

The other matter upon which the State places strong reliance in order to sustain this conviction is the fact that after the death of his wife, the appellant carried her body off and buried it in a hidden place, and thereafter sought to mislead the officers of the law by false information, in order to conceal what had occurred.

The disrespectful treatment by the appellant of the body of his wife after her death and his efforts to conceal her death deserve and have our unbounded condemnation, but our abhorrence of his conduct cannot be permitted to obscure the fact that these were matters occurring after the death of his wife, and that they cannot serve either to add to or take from the criminal responsibility for a death which had already occurred.

*State v. Turner et al.,* 117 S. C., 470, 109 S. E., 119, was in some respects a very similar case. In that case, Mack Turner, one of the defendants, was present when the homicide was committed, but the State failed to prove his active participation. It is shown by the transcript of record, however, that he participated in hiding the body of the deceased by placing it in a deep spot in a river, loaded down with heavy weights tied to the body; that he attempted to mislead the officers of the law, and that he also joined searching parties organized for the purpose of finding the deceased

after his disappearance. He was convicted on his trial, but on appeal to the Supreme Court the judgment of the Circuit Court was reversed, and the Court said that "while the whole case raised a suspicion, and a grave one at that" it did not warrant a verdict of guilty. The Court also further said: "His conduct after the homicide cannot convict him of an offense that the State failed to prove".

In like manner, the case now before us raises a suspicion, and a grave one at that, and the disrespect shown by the appellant for the dead body of his wife is so revolting, and naturally arouses such indignation, as almost to unbalance the sense of justice, yet all this cannot fairly serve to convict him of a crime that the State has failed to prove. Although we abhor to the utmost the conduct of the appellant following the death of his wife, we cannot evade our responsibility of requiring the State to prove before it punishes. The Court well said in *Crosby v. S. A. L. Ry.*, 81 S. C., 24, 61 S. E., 1064:

"Verdicts cannot be allowed to rest upon mere surmise, conjecture or caprice. The law is moved by material evidence, including proven facts and those presumptions which the law recognizes from motives of public policy and as founded in human experience. A court fails to exercise its high prerogative to administer justice according to law when it permits a verdict to stand which finds no support in the evidence."

We find no way of escape from concluding that the State has failed to prove appellant guilty of murder.

The case was submitted to the jury on the theory that the appellant was either guilty of murder or not guilty, and that no verdict could be found other than one of guilty of murder or not guilty. Before the charge to the jury the following exchange took place between the Court and counsel for the defense:

"The Court: Do you want me to charge the jury on the issue of manslaughter and involuntary manslaughter?

"Mr. Brown: No, sir, I don't think that's an issue in the case. Counsel has said that there is a possibility of the statute about criminal negligence being involved in this case, but I don't think so. On the question of simple manslaughter where there was provocation, I don't think there could possibly be that in this case, and I think, your Honor should charge the jury that he is either guilty of a deadly, intentional, plain, criminal murder, or that he is not guilty. Now, only by the wildest stretch of the imagination can you say that a man ought to watch his wife everytime she takes a pill or everytime my wife takes an anodyne.

"The Court: Unless you wish to argue to the jury along that line, I am not going to charge the jury that. I agree with you."

No objection was made by the State to this theory of the case, and there was apparent general acquiescence in it by counsel on both sides and by the Court. It might therefore be contended with much apparent plausibility that since we have found that the State has failed to prove appellant guilty of murder, he is entitled as a matter of right to an acquittal, but we are not inclined to hold the State bound to that extent by its apparent acquiescence in this theory of the case, because we think there was evidence upon which appellant's conviction of the offense of involuntary manslaughter could be justified, and we think that justice can only be accomplished and the law vindicated by remanding the case to the Circuit Court for the purpose of trying appellant on the charge of involuntary manslaughter.

The conclusion we have reached makes it unnecessary to give any special consideration to appellant's ground of appeal based upon the failure of the Circuit Judge to charge the jury on the law of involuntary manslaughter. Such charge will of course be given upon the retrial that is being ordered.

The judgment of the Circuit Court should be reversed, and the case remanded to that Court for the purpose of trying the appellant, Samuel C. Epes, on the charge of involuntary manslaughter.