16615

STATE v. JAMISON
(70 S. E. (2d) 342)

314

*Messrs. Cassandra E. Maxwell,* of Orangeburg, **and** *Harold R. Boulware* and *Lincoln C. Jenkins, Jr.,* of Colum-bia, *for Appellant,* cite:

*Messrs. Julian S. Wolfe, Solicitor,* and *Hydrick & Hydrick,* of Orangeburg, *for Respondent,* cite:

April 7, 1952.

TAYLOR, Justice.

Appellant was convicted of the charge of murder, with the jury recommending mercy, at the May, 1952, term of Court of General Sessions for Orangeburg County. Before sentence was passed, appellant moved for a new trial on the grounds that the evidence did not justify the verdict of the jury, but on the other hand proved the killing accidental. This motion was refused and the appellant was sentenced to serve life imprisonment in the State Penitentiary.

This case was tried on the theory, as stated in the motion for a new trial, that the killing was accidental. However, the position is taken in the appeal now before this Court that such killing was justified in that appellant was acting in defense of his home. To dispose of this question it is necessary to refer to the testimony. Appellant stated that on the night in question, March 18th, he, William Berry (the deceased), his brother, Andrew Berry, Annie Jamison, mother of the appellant, and Zilla Mae McCray, went to a barbecue near the town of Bowman, South Carolina, where they spent several hours eating barbecue and drinking whiskey. After leaving, they proceeded to another place where the party was continued. Leaving there, they drove to the rear of appellant's home, arriving at approximately 5 A. M. The testimony of various witnesses as to what took place there-

after cannot be reconciled. However, appellant himself states that upon arriving at his home his mother inquired of the driver of the car, William Berry, how much she owed him and he stated, "there is more than one way to pay, pay with more than money," that she and the deceased proceeded into the house, he remaining in the car approximately twenty minutes before entering, and stated, "I saw him standing over my mother. Her pocketbook was open. Her pants off. I asked him what he meant standing over my mother like that. He struck me, I fell. I ran into the room and got the gun and two shells. When I went to go out the gun went off. I did not know that I had hit him. I went to the back; put another shell in it. Andrew say, "What are you going to do with the gun'. I said nothing. We started tusseling over the gun. A shot went into the ground." Later in his testimony, he stated, "I got the gun he ran out and ran by me. I got almost to the bottom of the step and I stumbled and fell and the gun went off. I did not know that I had hit him. I went to the back. That is when Andrew asked about the gun." Later on he testified that he saw the deceased lying on the ground and imagined he was dead and went across the highway to Frances Folk's house to tell them that he believed he had shot a man and stated, "I ain't going to let nobody go in my house, not going to let nobody run over us." Still later he testified that he went around to the back of the house because "I wanted to ask his brother why he had the right to go there and stand over people. I did not know that he had got shot. I thought he had run around to the rear of the house." He further stated that he had not killed the deceased because he had taken money from his mother's pocketbook and that the deceased had not harmed him in any way, that he at that time did not know that William was shot and did not intend to shoot him. On cross-examination he was asked the question "Didn't you ask this man out of your yard?" to which he stated, "No, sir, I did not." Upon

being further queried about his stating that the deceased struck him, the following appears in the record:

"Q. Did you accuse him of taking some money from your mother; you did not think that? A. No, sir.

"Q. When you went toward him what did you do? A. He ran out and knocked me down.

"Q. What did he hit you with? A. His hand.

"Q. His fist? A. Yes, sir.

"Q. Where did he hit you? A. I don't know exactly.

"Q. Give the jury some idea. A. He came to me.

"Q. He hit you hard enough to knock you down and you were thoroughly sober. A. I was still drinking.

"Q. You recall where he hit you? A. No, sir.

\* \* \*

"Q. Did he hurt you? A. Could not when I was drinking.

"Q. How do you know that he hit you? A. Because he had to come by me to get out of the door.

"Q. He brushed by you? A. Yes, sir. Don't take much to knock a man down when he is drinking."

Other witnesses testified to the effect that appellant followed his mother and the deceased into the house almost immediately, that the deceased had left the house by way of the front door and was seventy feet from the steps when shot at close range with a shot gun, so close in fact that the wound was two inches in diameter with no shot scattered around, the load entering the center of the chest in bulk. The doctor testified that in his opinion the deceased died immediately where he fell as there was considerable blood there and none any other place. There is testimony also that immediately after the shot was fired in the front of the house, which killed William Berry, appellant attempted to kill his brother, Andrew Berry, who was still sitting in the car at the rear of the house, stating "I done got one and I will get the other one," but was prevented from doing so by having the gun taken away from him. One of the arresting officers stated that he reached the scene at approximately

7:30 A. M. and found the body lying seventy feet from the front steps with an empty shell fifteen feet from the body, that he arrested appellant and while in the car he stated "that Andrew Berry and William Berry brought him back home and got out of the car to help him and his mother in the house, and unlocked the door. Said he went into the house, and that he did not know about picking up the gun, that the gun was leaning against the wall; that he came back out and that Andrew Berry begged him not to shoot him, and said he threw up his hands and that he shot him, threw up both hands and that he shot him. He said he did not know why he had shot him." After being placed in jail, he made another statement the next day, but at no time made any different statement until the time of trial.

It must be kept in mind that on appeal from refusal of the trial court to direct a verdict or grant a motion for a new trial, the evidence and the inferences which may be reasonably drawn therefrom must be considered in the light most favorable to the State and if there be any evidence tending to prove the fact in issue or which reasonably conduces its conclusion as a fairly logical and legitimate deduction and not merely necessary a suspicion or conjecture in regard to it, the case should be submitted to the jury. *State v. Brown,* 205 S. C. 514, 32 S. E. (2d) 825; *State v. Turner,* 117 S. C. 470, 109 S. E. 119; *State v. Quinn,* 111 S. C. 174, 97 S. E. 62, 3 A. L. R. 1500; *State v. Roddey,* 126 S. C. 499, 120 S. E. 359; *State v. Walker,* 138 S. C. 293, 136 S. E. 215; *State v. Epes,* 209 S. C. 246, 39 S. E. (2d) 769.

The granting or refusal of a motion for a new trial is within the discretion of the Trial Judge and unless he commits an abuse of discretion, this Court is powerless to interfere. *State v. Johnson,* 213 S. C. 241, 49 S. E. (2d) 6.

We are of the opinion that the testimony, heretofore referred to, was sufficient to require the case being submitted to the jury and that there was no error in refusing appellant's motion for a new trial.

Appellant contends further that the State erred in that it attempted to weigh the testimony of the appellant against that of the Sheriff and the Deputy Sheriff and relies upon the case of *State v. Hariott,* 210 S. C. 290, 42 S. E. (2d) 385, to sustain his position. At no time was there an attempt to characterize the testimony of other witnesses, but appellant's version of the killing upon trial was entirely different from that testified to by the officers as having been told them shortly after the homicide by appellant. The State upon cross-examination inquired of appellant if he had made such statements to these officers to which he replied that he had not. We see no error therein and no objection was made at the time.

Appellant contends also that there was error on the part of the State in introducing testimony as to his alleged attempt to kill Andrew Berry. This testimony went into the record without objection; furthermore, appellant himself testified in detail as to what transpired between him and Andrew Berry, contending, however, that he at no time attempted to kill Andrew and had at no time stated that he had killed one and was going to kill the other. This question must therefore be resolved against the appellant.

Appellant contends that the Trial Judge should have charged the law of protection of the person and home and of one's habitation. It will be observed, however, that appellant at no time contended that he deliberately shot in order to protect his mother or the home, but contended throughout that the killing was an accident and that he was unaware that anyone had been shot until later. When asked if there had been any difficulty between him and deceased, he said "No", and when asked if he had ordered deceased to leave, answered "No". Under the circumstances there

was no evidence requiring the Trial Judge to charge the jury as contended.

Appellant further contends that the trial court should have further defined "reasonable doubt and provocation".

"The rule is thus stated in *State v. Myers,* 40 S. C. [555] ·556, 18 S. E. 892: 'As will be observed, in the first ground of appeal the appellant alleges that the circuit judge erred in failing to make a charge that appellant now thinks would have inured to his benefit. By numerous decisions of this court it has been held to be the law in this state that no such allegation of error will be considered in this court unless a request for such charge has been made to the circuit judge on the trial before him.' See 11 Ency. P. & P. 217, and the numerous authorities there cited. The author says: 'The failure of a judge to charge upon any material point usually results from inadvertence. and the law casts upon the parties the duty of calling the judge's attention to the matter. If he then refuses to give a proper requested instruction, such refusal is a ground of error; but a party cannot, in a court of error, avail himself of an omission which he made no effort to have supplied at the time. The court cannot be presumed to do more in ordinary cases than express its opinion upon the questions which the parties themselves have raised on the trial. It is not bound to submit to the jury any particular proposition of law unless its attention is called to it. If counsel desire to bring any view of the law of the case before the jury, they must make such view the subject of a request to charge, and. failing in this, they cannot assign error.' Any other doctrine would, we think, produce overwhelming embarassment and delay in the practical administration of justice. Under the Constitution of 1895 the rule has been applied in *State v. Smith,* 57 S. C. 489, 35 S. E. 727·; *State v. Chiles,* 58 S. C. 47, 36 S. E. 496; *Youngblood v. South Carolina & G. R. Co.,* 60 S. C. 9, 38 S. E. 232, 85 Am. St. Rep. 824; *Sudduth v. Sumeral,* 61 S. C. 276, 39 S. E.

534, 85 Am. St. Rep. 883; and other cases. The doctrine is based on acquiescence and waiver. It is true the Constitution of 1895 requires the judges in charging juries 'to declare the law.' But the right to have all the law declared may be waived like any other right, and an omission acquiesced in. The failure to request instructions on any particular point is regarded waiver of the right to such instruction and acquiescence in the omission." *State v. Adams,* 68 S. C. 421, 47 S. E. 676, 678.

No request was made for clarification or any further charge. At the conclusion of his charge, the Trial Judge inquired of counsel, "Is there anything further that you gentlemen would like to call to my attention?" Both sides replied in the negative.

We are of the opinion that all exceptions should be overruled and the appeal dismissed, and it is so ordered.

BAKER, C. J., and FISHBURNE, STUKES and OXNER, JJ., concur.